UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
at KNOXVILLE

JOHN D. JOSLIN,                    )
                                   )
        *Petitioner*,              )
                                   )
v.                                 )        No.:   3:99-cv-571
                                   )               (VARLAN/GUYTON)
                                   )
JAMES BOWLEN, Warden,              )
                                   )
        *Respondent*.              )

**<u>MEMORANDUM</u>**

This is a petition for the writ of habeas corpus pursuant to 28 U.S.C. § 2254 filed by

petitioner John D. Joslin ("Joslin"). The matter is before the court on the motion for

summary judgment filed by the Attorney General for the State of Tennessee on behalf of the

respondent, and Joslin's response thereto. For the following reasons, the motion to dismiss

and for summary judgment [Court File No. 9] will be **GRANTED**. This action will be

**DISMISSED WITH PREJUDICE**.


I.      <u>Standard of Review</u>


Under Rule 8 of the RULES GOVERNING SECTION 2254 CASES IN THE UNITED STATES

DISTRICT COURTS, the court is to determine, after a review of the answer and the records of

the case, whether an evidentiary hearing is required. If no hearing is required, the district

judge is to dispose of the case as justice dictates. If the record shows conclusively that Joslin

is not entitled to relief under § 2254, there is no need for an evidentiary hearing and the

petition should be denied. *Baker v. United States*, 781 F.2d 85, 92 (6th Cir. 1986).


II.     Factual Background

Petitioner Joslin, through counsel, has provided the court with copies of the relevant

documents pertaining to Joslin's direct appeal.  [Court File No. 2, Notice of Filing of

Documents, Addenda 1-16].  Joslin was convicted by a jury of second degree murder and

sentenced to a term of imprisonment of 23 years.  The conviction was upheld on direct

appeal, although the appellate court modified the sentence to 17 years in prison.  *State v.*

*Joslin*, No. 03C01-9510-CR-00299, 1997 WL 583071 (Tenn. Crim. App. September 22,

1997), *perm. app. denied, id.* (Tenn. November 9, 1998) [Addendum 5].  Joslin did not

pursue state post-conviction proceedings.

The Tennessee Court of Criminal Appeals summarized the evidence against Joslin as

follows:

> The record in this case is quite lengthy. The trial commenced on June
> 26, 1995. The jury returned a verdict on July 17, 1995. We begin here with a
> brief summary of the evidence presented, but we will provide additional
> pertinent facts related to specific issues as we address those issues. There is no
> question that on February 26, 1994, the Defendant shot and killed the victim,
> Rodney Shepard. The principal issue raised by the proof adduced at trial was
> whether the Defendant acted in self-defense or defense of a third person.

2

## A. State's Proof

At trial, the State presented the testimony of four witnesses to the shooting. Gary Massengill was riding as a passenger with the victim in the latter's truck on the morning of February 26, 1994. Massengill testified that he and the victim were going on a plumbing service call in Powell, Tennessee when they passed the intersection of Central Avenue Pike and Callahan Road. They were traveling north on Central Avenue Pike. As they proceeded through the intersection, Massengill saw a blue and silver van run the stop sign at the intersection and turn from Callahan Road into the lane in which he and the victim were driving. Massengill recognized the van as one belonging to the Defendant. Massengill testified further that shortly after turning toward the truck, the van lightly bumped the victim's truck from behind. The victim stopped the truck and exited the vehicle to investigate while Massengill remained in the truck. According to Massengill, the van and the truck were approximately twenty feet apart. Massengill then heard two gunshots in quick succession followed by a third gunshot a second later. When Massengill heard the shots, he looked in the side-view mirror and saw the victim lying on the street with blood coming out of his head. Massengill testified that as the third shot was fired, he saw the Defendant hanging out of the driver's side window of the van. Massengill then drove the truck away from the scene. The van followed soon after him. Massengill turned off Central Avenue Pike after a short distance, and the van continued down the road.

On cross-examination, Massengill admitted that the victim was his best friend. He also admitted that the victim's truck had no rear window so that the only way to see behind the vehicle was by using the side-view mirrors. Massengill testified that he had been drinking with the victim the previous night and had already drunk a sixteen-ounce beer on the morning of February 26. He stated that the bump from the van was so slight that it left no marks on or damage to the bumper of the truck. Massengill also admitted that there were inconsistencies regarding the distance from the victim to the vehicles between his initial statements to police officers and his testimony on direct examination. From his best recollection, Massengill stated that the victim was approximately twenty feet from his vehicle at the time he was shot. Massengill testified further that the distance from the back of the truck to the door of the van was twenty feet.

Judy Allen and her daughter, Michelle Flatt, were in another vehicle at the intersection of Central Avenue Pike and Callahan Road at approximately

3

1:00 p.m. on February 26, 1994. Flatt was driving and Allen was in the front passenger seat. Both individuals testified that they saw a blue and silver van traveling east on Callahan Road in the right-hand lane. The van switched lanes suddenly as it approached the stop sign at the intersection and turned north (left) onto Central Avenue Pike without stopping. Allen looked away for a moment. When she looked up again, she saw the victim's truck and the Defendant's van stopped in the northbound lanes of Central Avenue Pike approximately five to six feet apart. The victim was walking toward the van with the tips of the fingers of his left hand in his pants pocket and his right arm swinging casually at his side. When the victim reached the front bumper of the van, Allen saw two arms holding a pistol emerge from the driver's side window of the van. She then heard a gunshot and looked away for a second, during which time she heard another gunshot. When she looked back at the scene, she witnessed the Defendant lean out of the van's window and shoot at the victim as he lay on the ground beside the van's window. On cross-examination, Allen admitted that, based solely on her observation of the victim's actions, she believed there was going to be some type of fight after the vehicles came to a stop in the road.

Michelle Flatt testified that the truck and the van stopped approximately three to four feet apart on Central Avenue Pike. Flatt, like Allen, testified that the victim walked back toward the van with the tips of the fingers of his left hand in his pants pocket and his right arm swinging by his side. As the victim stepped past the front bumper of the van, Flatt saw the Defendant put both arms outside the van window. She then heard gunshots. Flatt echoed Allen's testimony that the Defendant leaned out of the van's window and shot at the victim as he lay on the street. On cross-examination, Flatt stated that she also believed there was going to be some type of fight after the truck and the van had stopped. Flatt admitted that, shortly after the shooting, she told police officers she could not tell whether the van had hit the truck. Flatt also admitted that the Defendant shot the victim as the latter reached the driver's side window of the van.

Phillip Murphy was traveling north on Central Avenue Pike near the intersection with Callahan Road on February 26, 1994. On direct examination, Murphy testified that he saw the Defendant's van bump the victim's truck from behind. According to Murphy, the victim exited the truck and examined his bumper. The victim then walked toward the van, talking and gesturing with his hands. Murphy testified that he believed there

4

might be an altercation. As the victim approached the van, Murphy saw arms emerge from the driver's side window. The victim was still six to eight feet away at that time and, according to Murphy, his arms and hands were up in the air. Murphy then heard two or more gunshots and saw the victim fall forward onto the street.

On cross-examination, Murphy admitted that he was a childhood friend of the victim. In fact, the victim referred individuals to Murphy's heating and cooling business. Murphy testified further that the victim appeared angry and upset as he approached the van. He also admitted that he had not actually seen the van bump the truck, but rather had seen the truck jolt. Murphy assumed that there had been contact between the vehicles. He stated that he did not know whether the victim had suddenly hit his brakes. During cross-examination, the Defendant produced a tape recording of a 911 call made by Murphy immediately after the shooting. On that tape recording, Murphy makes no mention of a bump between the vehicles and states that he could not determine whether the driver of the van was black or white.

Dr. John Neff testified regarding the cause of the victim's death. The victim had a single gunshot wound to the head. The path of the bullet ran roughly parallel to the level of the victim's ears and carried it straight through the brain. Dr. Neff testified further that there was no stippling associated with the wound. Stippling refers to the effect of powder and other bits of material in the shell casing actually impacting the wound site when a weapon is discharged at close range. He explained that the lack of stippling indicated that the shot was fired from at least eighteen to twenty-four inches away from the victim.

Two officers with the Knox County Sheriff's Department, James Phillips and John Wilson, testified that they arrived at the scene shortly after the shooting. After speaking with several witnesses, they learned that the suspect had been driving a blue and silver van. They then began to search the neighborhoods surrounding the scene for such a vehicle. As they were questioning an individual in the Heiskell Road area, the Defendant approached them on foot, identified himself as John Joslin, and stated that he owned a blue and silver van. Both officers testified that the Defendant appeared distraught or in shock. Officers accompanied him back to his residence.

Mike Lett, a detective with the Knox County Sheriff's Department, testified that he went to the Defendant's residence on the afternoon of February 26, 1994. Once he had arrived, the Defendant's wife, Sandra Joslin, informed Lett of the location of a pistol belonging to them. Lett recovered the .38 caliber revolver from the eave of the carport at the Defendant's home. The pistol was not loaded at that time. Lett also testified that police had taken measurements of the crime scene. There were blood stains on Central Avenue Pike approximately one hundred thirty-six feet from the intersection with Callahan Road.

Mike Upchurch, a detective with the Knox County Sheriff's Department, testified concerning a conversation he had with the Defendant on August 14, 1993. The Defendant had complained about harassing telephone calls and vandalism committed by an individual the Defendant believed to be Rodney Shepard, the victim. The Defendant asked Upchurch about the possible penalties for such offenses and the proof required. When informed that the offenses he was describing were misdemeanors punishable by up to eleven months and twenty-nine days in jail, the Defendant stated that he did not believe that type of punishment "would bother Mr. Shepard at all." According to Detective Upchurch, the Defendant "said that he guessed he'd just take care of it hisself."

On cross-examination, Upchurch confirmed that the Defendant called their office on the Monday after he had spoken with Upchurch and talked with Lieutenant Johnson about the telephone calls and vandalism. In addition, the Defendant called yet again on a later date and spoke with Officer Baird. Upchurch testified further that he was aware that the Defendant also approached the district attorney general's office. Defense counsel produced a report written by Detective Lett which stated that Upchurch had informed the Defendant in August of 1993 that, given the offenses the Defendant had described and the level of his proof, "they probably wouldn't do much to the subject because of this, that he didn't know whether he could get a warrant or not."

## B. Defense Proof

## 1. Testimony of the Defendant

The Defendant testified in his own behalf at trial. He stated that he had met the victim in 1988. The Defendant was adding a bedroom to his house at

that time. The victim had posted homemade signs throughout the community advertising that he did plumbing work. After reading these signs, the Defendant called the victim and eventually hired him to work on his bedroom addition. The Defendant testified that the victim did good work at a reasonable price. This arrangement began a relationship which was initially amicable. The Defendant often asked the victim to do repair work at his commercial rental properties. The victim accepted these jobs and did quality work according to the Defendant.

The Defendant and the victim became closer friends as time passed, and the Defendant visited the victim's home on Sam Tillery Road. He testified that he found the living conditions deplorable and thought the victim and his family deserved better. The victim informed him that he did not like his living conditions either, and that the neighborhood children were harassing his children. The victim eventually asked the Defendant if he would buy a house on Dante Road and rent it to him. The Defendant agreed.

Apparently the Dante Road home was in such a condition that it would not qualify for a loan. The Defendant therefore sold his retirement stock in order to have the money to purchase the home on Dante Road. He also executed an option to allow the victim to purchase the home from him during the next three years. The Defendant stated that they had agreed that the victim would renovate the electrical and heating systems so that the Dante Road home would qualify for a loan. The victim would then get a loan and purchase the house from the Defendant. According to the Defendant, the victim began several renovation projects on the house, but did not finish them. The Defendant loaned the victim money to finish some projects, but to no avail.

The victim eventually expressed a desire to move into a large garage-type commercial building owned by the Defendant. The Defendant discovered that this structure was not approved as suitable for habitation. He informed the victim that his family could not move into the building and, according to the Defendant, the victim became angry. The victim suddenly became "unavailable" to do repair work at the Defendant's commercial properties.

The victim later moved his trailer-home onto the back half of the Dante Road lot. He then requested that the Defendant give him the half of the lot surrounding the trailer. The Defendant inquired of the Knox County Planning Commission and was informed that the lot could not be split into two

7

residential lots because of a lack of square footage. He told the victim what he had learned. The victim became upset and said he was simply going to sell the trailer for one thousand dollars ($1,000). The Defendant told the victim that the trailer was worth much more money and wrote him a check for two thousand five hundred dollars ($2,500). The victim later tore that check into pieces.

The victim then began to complain about his neighbors around the Dante Road home. He asserted that his children were being harassed. The Defendant heeded the victim's displeasure with his home and told him that if he completed the renovations to get the house into selling condition (such that it would qualify for a loan), the Defendant would give him any amount over thirty-six thousand dollars ($36,000) for which the home sold. The Defendant also offered to pay for the renovation materials and for an individual to help the victim complete the repairs.

Soon after this offer, in February of 1992, the Defendant learned that the victim had purchased a nearby home on Bruin Road. The Defendant received a telephone call from one of the victim's neighbors on Dante Road informing him that the victim was gutting the Dante Road home as he moved out. The Defendant went to the Dante Road home and discovered that the victim was removing fixtures, duct work, the external air conditioner unit, and other materials from the Dante Road home. When asked about the air conditioner, the victim told the Defendant that he was taking the unit away from the Dante Road home because it was stolen. The Defendant testified that he did nothing about the gutting of the house because he did not want any trouble from the victim. He then began to talk to the victim's Dante Road neighbors and learned that the Shepard family had been harassing and threatening them. The neighbors also suspected the victim of being involved in selling illegal drugs. The Defendant called the city police department and learned that the victim had a criminal record. The Defendant testified that he was terrified to learn these things about the victim.

On October 28, 1992, the Defendant sold the Dante Road home to Carroll Votaw. Shortly thereafter, he and his wife received a telephone call from the victim. The victim was angry and vulgar, cursing the Defendant and saying that he "was going to destroy" the Defendant and everything he owned. The victim went on to threaten to kill the Defendant and warned him that he "better keep an eye over his shoulder." The victim also stated that "he was

going to post signs up in the community declaring all about John Joslin." He told the Defendant's wife that the Defendant had raped someone in the 1940s.

The Defendant testified that from this date until the day of the shooting, he received numerous vulgar and harassing telephone calls, some of which he was able to record on his answering machine. Included in the calls were threats to rape the Defendant's wife and daughter. He also discovered damage to several pieces of his commercial rental property located throughout the community. The calls and vandalism were apparently cyclical, with several instances occurring over a short period of time, usually over a weekend, followed by a period of no disturbances. The victim would often call near the time of the discovery of acts of vandalism and tell the Defendant, "It ain't over, S.O.B.; it ain't over."

The Defendant soon became very frightened of the victim. He would sometimes ask one of his adult sons to accompany him when he went to work on his commercial property. He testified that he called the police several times and learned that there was little that could be done about the harassing calls and vandalism unless he caught the perpetrator in the act. The Defendant also approached the local telephone company to inquire whether there was a way to stop or "trap" calls coming into his phone from a specific number. According to the Defendant's testimony, he was told that he could not "trap" calls from the victim's number because it was outside his local exchange. As time passed, the Defendant became more afraid, both for himself and for his family. He and his wife eventually instituted strict rules regarding answering the phone and the door if his children were home alone.

Approximately one to two weeks before the shooting, one of the Defendant's neighbors discovered a homemade sign posted near the Defendant's home. The Defendant soon discovered more signs and writing of the same nature on various public signs. The signs and writings contained language such as "beware John Joslin," often coupled with "John Joslin the rapist." Some signs contained language such as "John Joslin will rape your wife" or "John Joslin will fuck you." Photographs of these signs were introduced at trial. The Defendant testified that he recognized the victim's handwriting on some of the signs. He believed that the signs indicated the victim was "coming closer." As a result, the posting of the signs scared the Defendant.

9

With regard to the day of the shooting, the Defendant testified that he awakened early on Saturday, February 26, in order to search for more signs before other people began to drive in the neighborhood. He took a loaded pistol with him for protection purposes and drove through the neighborhood near his home. For the past twelve years, the pistol had usually been kept in a locked closet in his house. The Defendant found more signs that morning and recognized the Defendant's handwriting on them. He also found vulgar writing on the garage door of his adult son's place of business. He returned home later that morning to get ready to attend his adolescent son's church-team basketball game.

The Defendant's daughter was feeling ill that morning and decided to stay at home during the basketball game. The Defendant instructed his daughter not to answer the phone or come to the door while they were gone. When the Defendant arrived at the gymnasium, he and his wife spoke with the youth minister of their church, Randy Singleton, about the problems they had been having with the victim. After the game, the Defendant and his wife left quickly to check on their daughter. Their son was going to come home separately a short time later.

They approached the intersection of Callahan Road and Central Avenue Pike, traveling east on Callahan in the left lane. The Defendant intended to turn left on Central Avenue Pike to get back to his home on Heiskell Road, which was a short distance north from the intersection of Central Avenue Pike and Callahan. As he approached, he saw the victim's truck at the intersection heading north on Central Avenue Pike. Believing that the victim would turn west (left) onto Callahan Road in order to get to the interstate, the Defendant switched into the right lane of Callahan Road hoping to avoid the victim. The Defendant testified that the victim saw him approaching and "creeped" through the intersection, giving him an "angry stare." Rather than turning onto Callahan Road as the Defendant had expected, the victim continued straight through the intersection, traveling north on Central Avenue Pike.

The Defendant became worried that the victim was going to the Defendant's home, which was in the direction the victim was driving. He therefore switched back into the left lane of Callahan Road and turned left at the intersection so that he was traveling north on Central Avenue Pike behind the victim's truck. He stated that he stopped at the intersection, but the stop sign was set back a short distance from the actual intersection of the roadways. The Defendant testified that just after he turned into the lane following the

10

victim's truck, the victim slammed on his brakes and came to a stop in the middle of the road. The Defendant slammed on his brakes to avoid hitting the truck. At no time did he make contact with the victim's truck.

According to the Defendant's testimony, the victim jumped out of his truck, slammed the door and threw down a cigarette. He placed his hand in his pocket and approached the Defendant's van. At this point, the Defendant's wife screamed, "He's coming to kill us, John." The Defendant reached into the console beside his seat and pulled out the .38 caliber revolver he had left there earlier that morning. He "stuck it out the window" and said, "No, Rodney." The Defendant testified that the victim responded, "I'll kill you, motherfucker." The Defendant then fired a shot in the air over the victim's head. The victim lunged for the Defendant, reaching into his window and tugging at the Defendant's arm or safety belt. The Defendant leaned back and fired the gun twice.

The victim fell back from the van after the shots, but the Defendant did not know whether he had wounded the victim. At this time, the Defendant's wife exclaimed, "My God, John, here's the other one coming after us." The Defendant looked up to see Gary Massengill exiting the victim's truck. Massengill ran around to the driver's side of the truck and drove away. The Defendant followed the truck because it was traveling toward their home. The truck eventually turned off the road, and the Defendant proceeded to his house. The Defendant testified that he was in a state of shock after the shooting.

Once home, the Defendant did not return the .38 caliber pistol to its customary storage location inside the house. Instead, he placed the revolver on a ledge in his carport because he did not want his daughter to see him carrying the gun. He then told his wife that he was going to the Sheriff's Office to inform the authorities of what had happened. The Defendant's wife asked him to wait and to call an attorney before going. Since they did not know any attorneys, they called the minister of their church, who gave them the name of a lawyer. The minister told them he was coming to their home immediately. During this time, the Defendant noticed that police officers were at the home of one of his neighbors. He decided to approach the officers. Upon doing so, he informed the officers of his name and the fact that he owned a blue and silver van. Lieutenant Don Humphrey, whom the Defendant had known for a number of years, told the Defendant, "If you know anything about this situation, you had better go talk to you an attorney."

On cross-examination, the Defendant admitted that he did not consider the signs and vulgar writings threatening in and of themselves. Instead, he considered them to be more in the nature of harassment rather than threats. He did, however, believe them to be more of a threat when they began to be posted near his home. The Defendant was also confronted with a letter written to him by the victim in which the victim made many positive comments about and showed a concern for the Defendant and his family. The letter was supposedly written in late 1992 or early 1993, after the Defendant had received the threatening telephone call concerning his sale of the Dante Road home. The Defendant testified further that he did not remember doing anything to the revolver as he drove away from the scene of the shooting.

The assistant district attorney general also questioned the Defendant about whether he had rehearsed his testimony with his attorney as part of his pretrial preparation for the case. These questions, in turn, led to inquiries into whether the Defendant had been through a trial procedure before, referring to misdemeanor convictions that the Defendant received in 1973. This line of questioning is challenged by the Defendant on appeal. We will relate additional facts regarding these questions as we address those issues later in this opinion.

## 2. Corroborating Proof

The Defendant presented several witnesses to corroborate his testimony concerning the history between him and the victim as well as the events leading up to the shooting. James McCreary, one of the Defendant's neighbors, testified that he saw a homemade sign posted on a telephone pole approximately one hundred fifty yards away from the Defendant's home. The sign contained derogatory remarks about the Defendant. MrCreary [sic] removed the sign from the pole and took it to the Defendant. The Defendant became visibly shaken, upset, and nervous when he saw the sign. McCreary testified that the Defendant then told him about the vulgar and harassing telephone calls he and his family members had received from the victim. McCreary considered the sign to be threatening and seeing it in his neighborhood worried him. He later saw derogatory writing on stop signs in the neighborhood. On cross-examination, McCreary admitted that he had not seen the individual who had posted the sign on the telephone pole.

Lisa Scarbro testified that she worked at the Powell Deli. That building is owned by the Defendant and is apparently leased to the operators of the deli.

12

Scarbro testified that she does not know the Defendant. She confirmed that she once saw vulgar and derogatory writing referring to the Defendant on an exterior wall of the deli. On cross-examination, Scarbro admitted that she did not know who wrote on the wall.

Charles Edward Wright testified that he leased a building from the Defendant. One morning in 1992 he discovered that the exterior air conditioning unit had been knocked off its base. It appeared to Wright that the unit had been struck by a vehicle. Wright later spoke with the Defendant about the problems with the victim. Wright testified that the Defendant appeared to be fearful of the victim.

Dudley Cockrum testified that he was the minister at the Defendant's church. He had talked with the Defendant about the problems with the victim. Cockrum advised the Defendant to speak with the Sheriff's office. The Defendant told Cockrum that he had already done so. Cockrum testified further that the Defendant appeared to be afraid of the situation and seemed to feel trapped. Cockrum also confirmed that he received a telephone call from the Defendant on February 26, 1994, and gave the Defendant the name of an attorney.

Carroll Votaw testified that he purchased the home on Dante Road in October of 1992 after the victim and his family had moved. According to Votaw, the house was in extremely poor condition. Votaw called the victim to ask about information on the fixtures and duct work that had been removed from the home. He testified that the victim seemed more interested in the purchase agreement he had made with the Defendant. The victim appeared to be very angry with the Defendant. Votaw testified that the victim stated that the situation was far from settled and that "he probably would wind up killing the son-of-a-bitch." Votaw later spoke with the Defendant about the situation and stated that the Defendant was obviously scared. According to Votaw, the Defendant became more and more fearful as time passed.

Ernest Greer testified that he was the Defendant's uncle. Greer spoke with the Defendant about the problems the latter was having with the victim. Greer could not remember exactly when their conversations had occurred, but estimated them to have taken place six to ten months before the shooting. Greer related that the Defendant had stated that the vulgar graffiti and signs were in the same language as the harassing telephone calls he had received. On cross-examination, the assistant district attorney general asked Greer if he

realized the Defendant had testified that the graffiti and signs appeared only weeks before the shooting, rather than six to ten months. Greer then stated that he could not be sure about the timing of their conversations because he was eighty-three years old and could not remember everything.

The Defendant's children also testified at trial. Dean Joslin, the Defendant's son, testified that he operated an automotive repair garage out of a building leased to him by his father. Dean Joslin arrived at the garage one morning after his father had begun to have problems with the victim and found that his garage door had been severely dented by a vehicle. He found red paint matching the color of the victim's truck on the scene. He took measurements of the height of the dent and concluded it corresponded to the height of the bumper on the victim's truck. Dean Joslin also testified that a plate glass window was broken twice during this time. On the morning of Saturday, February 26, 1994, Dean Joslin discovered vulgar writing referring to the Defendant on the garage doors of his shop. Dean Joslin stated that he had conversations with his father about the situation with the victim. He testified that the Defendant was in constant fear of the victim. On cross-examination, Dean Joslin admitted that in his deposition for a civil case arising from the shooting, he stated that the Defendant was not "scared to death" of the victim.

Daniel Charles Joslin, another son of the Defendant, echoed Dean Joslin's testimony about his father's mental state. He testified that the Defendant was terrified of the victim. Benjamin Allen Joslin also testified that the Defendant was scared of the victim. Benjamin Allen Joslin stated that his father spoke with him about the vandalism and harassing telephone calls. Those conversations began approximately one year before the shooting.

John Isaac Joslin and Geneva Rose Joslin, the adolescent children of the Defendant, both testified that they answered harassing telephone calls in which the victim used vulgar and threatening language. They spoke with the Defendant about the telephone calls they received. They both testified that the Defendant appeared to be scared. In fact, the entire family was fearful and felt like they were being stalked. On cross-examination, John Isaac Joslin admitted that he remembered receiving only seven or eight harassing calls from the victim. Geneva Joslin remembered two calls distinctly, but testified that she received more calls which she simply could not remember.

Randy Singleton, the youth minister at the Defendant's church, testified that he saw the Defendant and his wife shortly before a basketball game on the

14

morning of Saturday, February 26, 1994. He cordially asked the Defendant how he was doing. After an initial pleasant answer, the Defendant's wife began to cry and the Defendant confided in Singleton that they were not doing well. The Defendant told Singleton that his family was being persecuted by a man. The Defendant related that they had received harassing telephone calls and had discovered derogatory signs posted in their neighborhood. Singleton testified that the Defendant's hands were shaking as he recounted this information. In Singleton's opinion, the Defendant appeared very frightened. On cross-examination, Singleton admitted that the Defendant never specifically told him that he was fearful of the victim.

The principal witness offered to corroborate the Defendant's testimony about the events leading up to the shooting was the Defendant's wife, Sandra Joslin. Sandra Joslin testified that she and her husband received a threatening telephone call from the victim on October 28, 1992, after the sale of the Dante Road home to Carroll Votaw. From that time until the shooting, members of the Joslin family continued to receive vulgar and threatening telephone calls from the victim. According to Sandra Joslin, these calls included threats to rape her, threats to rape Geneva Joslin, and threats to kill the Defendant. Approximately a week before the shooting, one of their neighbors brought them a homemade sign containing derogatory, vulgar writing referring to the Defendant. The neighbor had found the sign posted on a pole very near their home. The close proximity of the sign to their home frightened her and her entire family.

Sandra Joslin confirmed that on the morning of Saturday, February 26, 1994, she and her husband attended their son's church basketball game. Their daughter remained at home because she was ill. On the return home from the game, her husband was driving their van and she was in the front passenger seat. They were traveling east on Callahan Road approaching the intersection with Central Avenue Pike. The Defendant was driving in the left lane and intended to turn left at the intersection, which would take them directly toward their home. As they neared the intersection, she saw the victim's truck. Her husband switched into the right lane, which automatically turns south (right) onto Central Avenue Pike, in order to avoid passing close to the victim's truck. The victim drove slowly through the intersection in the direction of their home and stared at them. Given that their daughter was at home alone, this action alarmed Sandra Joslin and her husband, prompting her husband to switch lanes again and turn left at the intersection, following the victim's truck as it proceeded north on Central Avenue Pike.

15

After a short distance, the victim suddenly slammed on his brakes and came to a stop in the road. The Defendant slammed on his brakes to avoid hitting the truck from behind. According to Sandra Joslin's testimony, the victim "jumped out of his truck and started bounding back toward our vehicle in a very mad rage. He ran his hand in his pocket and continued toward our vehicle." As the victim continued toward the van, Sandra Joslin exclaimed, "He's going to kill us." She heard her husband say, "No, Rod" and saw him stick his revolver out of the van's window. She heard the victim say, "I'll kill you mother--fuckers." At that point, Sandra Joslin ducked down in her seat.

Sandra Joslin then heard gunshots and looked up a moment later. She saw another individual exit the victim's truck. She said to her husband, "John, watch it; there's another one." That individual got back into the truck, however, and drove away. They followed the truck, heading toward their home. After a short distance, the truck turned off the road and they continued to their house. Sandra Joslin testified further that, on the way home, the Defendant removed the bullets which remained in the revolver and threw them out of his window.

On cross-examination, the assistant district attorney made much of Sandra Joslin's testimony that the victim said the plural "motherfuckers" as he approached their van rather than the singular. The assistant district attorney confronted her with a copy of a deposition given for the civil case arising from the shooting in which she stated that the victim used the singular form of the word. After repeated inquiries by the prosecutor, Sandra Joslin testified that she could not be sure whether the victim had used the plural or the singular.

### 3. Character of the Victim

The Defendant also presented several witnesses who testified concerning the character of the victim. Dean Joslin, one of the Defendant's sons, testified that he came to know the victim through his father. The victim eventually was hired to do plumbing work for Dean Joslin. Dean Joslin came to know the victim as time passed, and the victim visited him at Joslin's automotive repair shop. Based on their relationship, Dean Joslin developed the opinion that the victim was an aggressive, violent person. Daniel Charles Joslin, another one of the Defendant's adult sons, also developed a relationship with the victim. He, like Dean Joslin, testified that the victim was, in his opinion, an aggressive, violent person.

David Riley testified that he was a neighbor of the victim when he lived on Sam Tillery Road, prior to the victim's move to the Dante Road home. Riley stated that, based on his knowledge and observations, the victim had a reputation as a violent, aggressive person. On cross-examination, Riley testified that he did not know the Defendant and had not told the Defendant about his knowledge of the character of the victim.

In one of the more bizarre developments during this trial, the Defendant presented the testimony of Robert Ferguson. Ferguson was married to the victim's sister-in-law and came to know the victim in early 1993. The following colloquy occurred during the direct examination of Ferguson.

> Q. Did you hear what other people said about Rodney Shepard?
> A. I heard other people say he was a little bit of a hothead when he was drinking.
> Q. Well--okay. I--I didn't--I just--you have heard other people talk about him?
> A. Yes, sir.
> Q. Sir, do you have an opinion as to the character of Rodney Shepard for being an aggressive person or being a peaceful person?
> A. I feel like he was a peaceful person 99 percent of the time.
> Q. Was there times when he was an aggressive person, sir?
> A. When he was drinking, yeah.
> Q. Do you have an opinion, sir, for Rodney Shepard's reputation for being a peaceful person or a violent person?
> A. I've heard him make threats about other people and to myself, but I've never known him to actually commit a violent act.
> Q. Do you have an opinion as to his reputation for being violent, sir?
> A. I don't feel like he was violent.
> Q. You don't?
> A. No.

Later during the direct examination, Ferguson was asked to describe an incident which occurred at the Shepard home. Ferguson witnessed the victim talking about the Defendant and making a telephone call to the Defendant. Defense counsel questioned Ferguson as follows:

Q. Okay. What, if anything, happened with regard to John Joslin?

A. That was the first time I ever heard John Joslin's name, was when I was there.

Q. How did it come up?

A. Something was said concerning signs that had been hung up. And Rodney was drinking, and then he made a phone call.

Q. Would you, please, tell the members of the jury who it was Rodney said he was calling?

A. John Joslin.

Q. What did he say as he made that phone call in your presence and in the presence of the people you specified?

A. He was cussing about John Joslin ripping him off.

Q. Did he say what he was going to do to John Joslin?

A. He was screaming and hollering about John Joslin.

Q. Did he say what he was going to do to John Joslin?

A. I don't recall any specifics.

Q. Do you recall him saying to John Joslin "I'm going to kill you, you sonofabitch"?

A. I don't know if he was actually talking to John Joslin or it was before he answered the phone.

Q. Do you recall him saying that?

A. Yes.


Defense counsel then confronted Ferguson with a written statement he had signed shortly before testifying. Ferguson admitted that, in the statement, he stated that he believed the victim to have been a violent, aggressive person during his lifetime.

Although it appears that Ferguson's testimony at trial differed somewhat from his written statement and thus surprised defense counsel to a certain degree, the direct examination was rather ordinary. At the conclusion of direct examination, however, an odd turn of events occurred. Defense counsel requested a jury-out hearing, apparently to alert the trial court that he desired to ask Ferguson about his knowledge about specific violent acts committed by the victim against third persons. During this hearing, Ferguson asked to address the trial court. Ferguson stated that, during the days before he testified, defense counsel asked him to place matters in a different light

18

when he was testifying. Ferguson also stated that he was "asked to add more to it than what the truth is."

At that point, defense counsel asked that the witness be removed from the courtroom so that they could discuss the matter. Once Ferguson had left the courtroom, defense counsel informed the trial court that he had tape-recorded his conversations with Ferguson. Defense counsel explained that he had originally spoken with Ferguson many months earlier and learned that, according to defense counsel, Ferguson had witnessed violent acts of the victim and was of the opinion that the victim was a violent, aggressive person. Subsequent to their initial conversation, Ferguson pleaded guilty to a bank robbery charge and was incarcerated in a federal penitentiary. He was transported to Tennessee at the beginning of the Defendant's trial in order to testify for the defense.

Prior to Ferguson's testimony, defense counsel learned that an assistant United States attorney had arranged a conversation between himself, Ferguson and the assistant district attorney general prosecuting the Defendant. Defense counsel began to suspect that, in his words, something "was amiss." As a result, defense counsel decided to record the conversations he had with Ferguson. From his comments, it appears that defense counsel believed the tapes would demonstrate that he had not pressured Ferguson in any way nor suggested that Ferguson exaggerate his testimony. He then offered the written statement and the tape recordings as *Jencks* material.

At this point, the assistant district attorney general requested that he be permitted to review the original tape recordings alone. Defense counsel stated that he would make a copy of the tapes but did not want to give the originals to the prosecutor. It appears that defense counsel had conferred with Ferguson only a half hour before he testified. Defense counsel stated that he had not had time to copy the tapes yet. It is unclear whether there were any prior meetings between defense counsel and Ferguson (other than their original conversation several months earlier) and whether these meetings were recorded. The trial court ordered defense counsel to allow the prosecutor to review the original tapes alone. Defense counsel refused. The trial court then found that defense counsel had violated Rule 26.2 of the Tennessee Rules of Criminal Procedure. Accordingly, the trial court ordered Ferguson's testimony stricken from the record.

The assistant district attorney general, however, requested that Ferguson's testimony not be stricken, but rather that he be allowed to testify that defense counsel had pressured him. The trial court agreed. As a result, on cross-examination, Ferguson stated that defense counsel had promised that he "would be very well taken care of and compensated" if he testified favorably. Moreover, defense counsel promised that he would file a letter seeking a downward departure in Ferguson's bank robbery sentence. Ferguson testified that defense counsel asked him "[t]o make statements stronger concerning the statements I'd made to him in the past, go into further detail, more aggressive detail. Making them more than what they was."

Faced with that testimony on cross-examination, defense counsel sought to ask Ferguson on redirect about details of the written statement and whether they were true or whether they were exaggerated. A copy of Ferguson's signed, written statement had been provided to the prosecutor at the conclusion of direct examination pursuant to Tennessee Rule of Criminal Procedure 26.2.

The prosecutor objected "to references to anything because of Mr. Moncier's [defense counsel] actions during the recess." The prosecutor appears to be referring to defense counsel's decision not to allow him to review the original tapes alone. The trial court sustained numerous objections by the prosecutor, curtailing any redirect examination concerning Ferguson's written statement and whether his direct testimony was exaggerated. Defense counsel was able to ask Ferguson, "when I have talked to you on each occasion, and including the lunch recess before this, did I tell you to tell the truth?" Ferguson responded affirmatively.

### 4. Expert Testimony Regarding the Defendant's Mental State

The Defendant also presented expert testimony regarding his mental state through Dr. Eric Engum, a clinical psychologist. Dr. Engum examined the Defendant on three separate occasions after the shooting at the request of the Defendant's treating psychiatrist, Dr. Catherine Gyurik. The trial court allowed Dr. Engum to testify regarding the Defendant's statements to him which formed the basis for his conclusions about mental state. As a result, Dr. Engum related substantially the same history between the Defendant and the victim as well as the events leading up to the shooting as the Defendant testified to on direct examination.

20

Based on what the Defendant told him and the results of psychological testing, Dr. Engum formed an opinion concerning the personality characteristics of the Defendant on February 26, 1994. Dr. Engum testified that the Defendant had passive-aggressive and narcissistic personality features that were pervasive, long-standing and existed throughout his adult life. More specifically, Dr. Engum testified that passive-aggressive individuals tend to be withdrawn and do not confront problems directly. They are not dominant or assertive, but rather tend to allow other people to make major decisions. They also tend to be somewhat ineffective in social situations. Narcissistic individuals are the type of people who "pull themselves up by their own bootstraps." They are self-made and tend not to be particularly well-educated.

Dr. Engum testified further concerning stress and its effect upon people in general as well as on the Defendant. Dr. Engum explained that stress provokes certain autonomic nervous system responses such as increased heart rate and rapid, shallow respiration. Individuals under stress become acutely sensitive to visual and auditory stimuli, but their cognitive processes are limited so that they do not reason in a logical, straightforward fashion. Dr. Engum concluded that, accepting the Defendant's account of the history between him and the victim and the events immediately prior to the shooting, the Defendant was under acute stress at the time of the shooting.

Dr. Engum found that, given the Defendant's personality characteristics and the history between him and the victim (again, as related by the Defendant), the Defendant became increasingly sensitized to the threat posed by the victim as time passed. Dr. Engum concluded that the Defendant had perceived the actions of the victim immediately prior to the shooting to be a threat to his safety.

On cross-examination, Dr. Engum again admitted that his conclusions were based solely on what the Defendant had related to him and his discussions with the Defendant's treating psychiatrist, Dr. Gyurik. Dr. Engum did not consult any of the witnesses to the shooting presented by the State during their case-in-chief, namely Judy Allen, Michelle Flatt, Phillip Murphy or Gary Massengill. In addition, the following colloquy took place:

Q. Are you aware and did you take it into account in your assessment of Mr. Joslin's perception of stress and fear that Mr. Joslin ran into the back of Mr. Shepard's truck?

21

A. I am aware that he bumped into it--yes, sir. I am aware that he bumped into it when Mr. Shepard stopped.

Q. Okay. Who told you that?

A. I believe Mr. Joslin did, and I clearly remember that when Mr. Moncier [defense counsel] and I talked in January, that that was a point that came up.

Q. So, Mr. Joslin told you that he bumped into the back of Mr. Shepard's truck?

A. To the best of my recollection, I believe that there was some contact between the two vehicles.

On redirect examination, however, Dr. Engum reviewed the notes he had taken as he interviewed the Defendant and stated that there was no indication in those notes that the Defendant had bumped the victim's truck. Dr. Engum testified that, on reflection, he received information about the bump from a meeting with defense counsel after his interviews with the Defendant. Dr. Engum also reiterated that passive-aggressive individuals such as the Defendant tend not to address issues directly but rather wait and hope that the issues will resolve themselves.

## 5. Testimony Offered to Rebut the State's Proof

The Defendant also presented the testimony of John Hyde to attack the credibility of the testimony of the State's witnesses to the shooting. Hyde testified that he is a traffic engineer, accident reconstructionist and visual perception (sight distance) expert. Hyde examined the Defendant's van and the victim's truck and concluded that there had been no contact between the vehicles. Hyde based his conclusion on the lack of scratches or markings consistent with contact between the vehicles. He testified further that an individual stopped at the intersection of Callahan Road and Central Avenue Pike would not have been able to see the front of the Defendant's van or the rear of the victim's truck assuming that the vehicles were in the approximate position that had been testified to earlier in the State's case-in-chief. Hyde's testimony apparently refers to the positions of Judy Allen, Michelle Flatt and Phillip Murphy and their lines of sight.

On cross-examination, Hyde admitted that he was an expert witness paid by the defense and had not been at the scene during the shooting. He testified that he had not talked with the State's witnesses to aid him in forming

22

his opinions. He also admitted that he had not examined the victim's truck "up close" but rather from a slight distance.

## C. State's Rebuttal Proof

In rebuttal, the State presented the testimony of Don Provonsha. Provonsha testified that he was an agent with the Federal Bureau of Investigation. Provonsha stated that defense witness Robert Ferguson has a poor reputation for truth and veracity. On cross-examination, Provonsha admitted that an assistant United States attorney holds some sentencing consideration power over a federal prisoner such as Robert Ferguson.

Steve Worley, an employee of the Powell Telephone Exchange, also testified for the State in rebuttal. Worley stated that the telephone company had the technical ability to trace calls throughout Knoxville and the surrounding areas as of November 10, 1992. Worley testified that he had found no record of complaints from the Defendant about harassing telephone calls, nor had he found any requests from the Defendant to trace calls. On cross-examination, Worley admitted that the area in which the telephone company could "trap" calls was smaller than the "trace" area. Worley stated that during the relevant time period, the company could not "trap" calls coming in from outside a localized area such as from Knoxville to Powell.

## D. Jury Verdict

On May 18, 1994, the Defendant was indicted on one count of first degree murder. At trial, he pleaded not guilty and asserted self-defense and defense of a third person. At the conclusion of the proof, the trial court charged the jury on first-degree murder, second degree murder and voluntary manslaughter. After considering all of the evidence, the jury found the Defendant guilty of second degree murder.

*State v. Joslin*, slip op. at 3-33, 1997 WL 583071 at **1-17 (footnotes omitted).

In support of his habeas corpus petition, Joslin alleges the following five grounds for relief, the first two with numerous subparts and sub-subparts:

I.       Petitioner's Fundamental Constitutional Rights to a Fair Trial, Due Process of Law, an Impartial Trial Judge, and the Effective Assistance

23

of Counsel Were Violated by the Court of Criminal Appeals' Incorrect Application of the Harmless Error Rule.

II.    The Cumulative Constitutional Errors Relating to the Petitioner's Presentation of His Theory of Defense, Violated Petitioner's Fifth and Fourteenth Amendment Rights to a Fair Trial and Due Process of Law.

III.   The Prosecutorial Misconduct So Infected Petitioner's Trial as to Violate His Right to a Fair Trial and Due Process of Law.

IV.    The Trial Court Displayed Judicial Bias Which Denied Petitioner the Right to a Fair Trial and the Due Process of Law under the Fifth and Fourteenth Amendments.

V.     The Cumulative Effect of All of the above Errors Denied Petitioner His Fifth and [Fourteenth] Amendment Rights to a Fair Trial and the Due Process of Law.

[Court File No. 1, Petition for Habeas Corpus, Table of Contents].  The Attorney General contends the respondent is entitled to judgment as a matter of law based on the findings of the Tennessee state courts.


III.   <u>State Court Findings</u>

Pursuant to 28 U.S.C. § 2254(d), Joslin may not obtain federal habeas corpus relief with respect to a claim that was adjudicated on the merits in a state court proceeding unless the state court decision (1) was contrary to, or involved an unreasonable application of, clearly established federal law or (2) was not reasonably supported by the evidence presented to the state court.  In addition, findings of fact by a state court are presumed correct and

Joslin must rebut the presumption of correctness by clear and convincing evidence. 28 U.S.C. § 2254(e).

The Supreme Court, in *Williams v. Taylor*, 529 U.S. 362 (2000), clarified the distinction between a decision "contrary to," and an "unreasonable application of," clearly established Supreme Court law under § 2254(d)(1). A state court decision is "contrary to" Supreme Court precedent "if the state court arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law or if the state court decides a case differently than [the Supreme Court] has on a set of materially indistinguishable facts." *Id*. at 413. A state court decision "involves an unreasonable application of clearly established Federal law" only where "the state court's application of clearly established federal law was objectively unreasonable." *Id*. at 409. A federal habeas court may not find a state adjudication to be "unreasonable" "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Id*. at 411.

IV.   <u>Discussion of Grounds for Relief</u>

   **I.     Petitioner's Fundamental Constitutional Rights to a Fair Trial, Due Process of Law, an Impartial Trial Judge, and the Effective Assistance of Counsel Were Violated by the Court of Criminal Appeals' Incorrect Application of the Harmless Error Rule.**

Joslin contends that the conclusions of the Tennessee Court of Criminal Appeals were based upon an unreasonable application of clearly established federal law, specifically the "harmless error" rule established in *Chapman v. California*, 386 U.S. 18 (1967): "We conclude that there may be some constitutional errors which in the setting of a particular case are so unimportant and insignificant that they may, consistent with the Federal Constitutional, be deemed harmless, not requiring the automatic reversal of the conviction." *Id*. at 22. The Court was concerned with "small errors or defects that have little, if any, likelihood of having changed the result of the trial." *Id*. In addition, "before a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt." *Id*. at 24.

According to Joslin, the Tennessee Court of Criminal Appeals looked to the wrong factors in considering the alleged errors set forth in part II. of this discussion, *infra*, under the harmless error rule. Joslin alleges that the appellate court relied on the following factors: the length of the trial, the fact that the prosecution had a reasonably strong case, and the effective cross-examination of Joslin. While the appellate court did note these factors, the court repeatedly found that the trial court's errors were "harmless beyond a reasonable doubt" because the errors "did not affect the result of the trial." This conclusion comports with the requirement of *Chapman*.

Joslin relies on *Sochor v. Florida*, 504 U.S. 527 (1992), for the proposition that "[a]n appellate court's bald assertion that an error of constitutional dimensions was 'harmless' cannot substitute for a principled explanation of how the court reached that conclusion." *Id*.

at 541 (O'Connor, J., concurring). In *Sochor*, the state court did not mention "harmless error" at all, let alone perform a harmless error analysis. The Supreme Court granted habeas corpus relief, while noting that the Court would not "require a particular formulaic indication by state courts before their review for harmless federal error will pass federal scrutiny." *Id*. at 540 (majority opinion). Thus, a state court must give reasons to support its conclusions that trial errors were harmless, which Tennessee Court of Criminal Appeals did in this case.

Joslin also alleges that the Tennessee Court of Criminal Appeals shifted the burden of proof, from the State to prove that the errors were harmless, to Joslin to prove that the errors were prejudicial. The State "bears the burden of proving" that a federal constitutional error "was harmless beyond a reasonable doubt." *Brecht v. Abrahamson*, 507 U.S. 619, 630 (1993). It is evident from reading the opinion of the Tennessee Court of Criminal Appeals that the State was required to carry the burden of proving that the errors were harmless; the appellate court did not shift the burden to Joslin.

Joslin also claims the Tennessee Court of Criminal Appeals erroneously applied the harmless error rule in those instances where it found the trial court had abused its discretion, specifically in the admission of evidence. Joslin argues that a trial judge has broad discretion to exclude admissible evidence. Thus, a finding by an appellate court that the trial court abused its discretion in excluding evidence leads to the conclusion that the evidence was admissible, its probative value was not outweighed by unfair prejudice, and the excluded evidence was not cumulative. In addition, Joslin argues that the exclusion of evidence cannot constitute error unless a substantial right of the defendant was affected. Therefore, according

27

to this argument, a finding that a trial court's abuse of discretion was harmless error is inconsistent because, a finding that the trial court abused its discretion includes an inherent finding of prejudice against the defendant.

Joslin's argument lacks merit. The Sixth Circuit has applied the harmless error rule in cases where the issue involved an alleged abuse of discretion by the trial judge. *See, e.g., Akrawi v. Jabe*, 979 F.2d 418, 423 (6th Cir. 1992); *Stevens v. Bordenkircher*, 746 F.2d 342, 347 (6th Cir. 1984).

With the foregoing principles in mind, the court will consider Joslin's claims of trial error and abuse of discretion. In reaching its conclusion, this court has carefully considered the transcript of Joslin's entire three-week trial, including the numerous jury-out hearings on evidentiary issues, as well as the testimony of witnesses, closing arguments, and jury charge. [Court File No. 2, Addendum 1, Transcript of the Evidence, vol. 1 – 27, pp. 1 – 2676].

## II. The Cumulative Constitutional Errors Relating to the Petitioner's Presentation of His Theory of Defense, Violated Petitioner's Fifth and Fourteenth Amendment Rights to a Fair Trial and Due Process of Law.

Joslin alleges that the numerous evidentiary errors regarding presentment of his case in chief, the curtailment of his right to cross-examine the witnesses against him, the improper impeachment of his credibility, and the misleading jury charge regarding self-defense operated to deprive him of a meaningful opportunity to present his theory of self-defense. Criminal defendants in state court proceedings have a constitutional right to present a

28

defense. "Under the Due Process Clause of the Fourteenth Amendment, criminal prosecutions must comport with prevailing notions of fundamental fairness. We have long interpreted this standard of fairness to require that criminal defendant be afforded a meaningful opportunity to present a complete defense." *California v. Trombetta*, 467 U.S. 479, 485 (1984). *See also Chambers v. Mississippi*, 410 U.S. 284, 294 (1973) ("The right of an accused in a criminal trial to due process is, in essence, the right to a fair opportunity to defend against the State's accusations.").

As the court has noted, in a collateral attack on a state criminal conviction pursuant to habeas corpus proceedings, the petitioner has the burden of establishing that the appellate court's finding of harmless error was "objectively unreasonable." *Williams v. Taylor*, 529 U.S. at 409. In determining whether an error was harmless, a federal court in a habeas corpus proceeding must look to the effect of the error on the jury.

> For purposes of federal habeas corpus review, a constitutional error that implicates trial procedures is considered harmless unless it had a "substantial and injurious effect or influence in determining the jury's verdict." This standard of review requires the reviewing court to examine the effect of the error on the jury rather than the sufficiency of the evidence at trial.

*Calvert v. Wilson*, 288 F.3d 823, 833 (6th Cir. 2002) (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 623 (1993)).

This is a lesser standard than *Chapman*'s requirement that the error be harmless beyond a reasonable doubt. The Court in *Brecht* explained why:

> Overturning final and presumptively correct convictions on collateral review because the State cannot prove that an error is harmless under *Chapman* undermines the States' interest in finality and infringes upon their

> sovereignty over criminal matters. Moreover, granting habeas relief merely
> because there is a "reasonable possibility" that trial error contributed to the
> verdict is at odds with the historic meaning of habeas corpus – to afford relief
> to those whom society has "grievously wronged."

507 U.S. at 637 (quoting *Chapman v. California*, 386 U.S. at 24 (internal quotations omitted)). Thus, for Joslin to prevail on his allegations that the Tennessee Court of Criminal Appeals unreasonably applied the harmless error rule of *Chapman*, this court must find that the errors had a substantial and injurious effect or influence on the jury.

### A. *Evidentiary Errors*

Joslin relies on three different types of evidentiary errors, each of which are set forth below.

**1. Exclusion of expert witnesses.** Joslin alleges the trial court erred in excluding four expert witnesses: Dr. Catherine Gyurik, Lamar Miller, John Hyde, and Thomas Dillard. The appellate court agreed the exclusion of these witnesses constituted error, but that the error was harmless.

Dr. Gyurik was Joslin's treating psychiatrist, who was to testify as to Joslin's mental state. Mr. Miller was a handwriting expert who had compared samples of the victim's handwriting with the derogatory signs. Dr. Gyurik and Mr. Miller were excluded on the basis of discovery violations. The appellate court found "that the trial judge abused his discretion by excluding the testimony of the expert witnesses without even considering other

possible remedies" for the discovery violations.  *State v. Joslin*, slip op. at 73-74, 1997 WL

583071 at *39.  The court, however, found the error harmless:

> In our view, the exclusion of the testimony of the Defendant's expert witnesses was nevertheless harmless error. The record is unclear as to what Dr. Gyurik's testimony would have been. The Defendant does concede that her testimony would have been largely cumulative of Dr. Engum. He asserts that her testimony would have been useful to rebut the false impression that Dr. Engum learned of the alleged bump between the vehicles from the Defendant. It appears that Dr. Engum rebutted that impression himself on redirect examination. We believe that Dr. Engum provided a thorough explanation of the Defendant's psychological characteristics and that Dr. Gyurik's testimony would have added little to Dr. Engum's testimony. We therefore conclude that the exclusion of her testimony did not affect the result of the trial.

> With regard to the expert handwriting evidence, it appears that Lamar Miller would have testified that some of the derogatory signs and writing contained handwriting matching known examples of the victim's handwriting. In spite of the exclusion of the expert testimony, the Defendant was permitted to offer lay testimony from several witnesses who stated that they recognized the victim's handwriting on the derogatory signs and writings. Furthermore, the State did not seriously contest that testimony. We are confident that the jury had ample evidence before it to assess the source of the derogatory signs and writings. Accordingly, we conclude that the exclusion of the expert handwriting testimony did not affect the result of the trial.

*Id.*, slip op. at 74-75, 1997 WL 583071 at *40 (citations omitted).

The testimony of John Hyde, an accident reconstructionist, was also excluded based

upon a discovery violation.  The appellate court found the exclusion of Mr. Hyde's testimony

likewise did not affect the result of the trial.

> During the State's case-in-chief, defense counsel cross-examined several witnesses with the aid of a large, professionally-prepared diagram of the scene of the shooting. The prosecutor voiced some concern that the diagram was "proportional" rather than "to scale." As a result, it appears that during the course of the trial the Defendant employed an accident reconstructionist, John Hyde, to render the diagram "to scale." When the

31

Defendant called Hyde to testify, the prosecutor objected to his rendering the diagram to scale. The prosecutor asserted that he had not received a report detailing the expert's findings. As a result, the trial court excluded any of Hyde's testimony aimed at placing the diagram to scale.

Regardless of our conclusion about the propriety of the trial court's exclusion of the evidence on the basis of a discovery violation, we do not believe that the Defendant has demonstrated any prejudice resulting from the trial court's ruling. In fact, the Defendant's brief does not allege that he was prejudiced in any way. Moreover, the trial court permitted Hyde to testify that in his expert opinion, an individual stopped at the intersection would not have been able to see the rear of the victim's truck or the front of the Defendant's van if the scene were as it had been described during the State's proof. From our review of the record, it seems that the importance of rendering the diagram to scale would have been to suggest that the State's witnesses to the shooting were not in a position to see the rear of the truck or the front of the van. Accordingly, we can only conclude that the exclusion of that portion of Hyde's expert testimony aimed at rendering the diagram to scale did not affect the result of the trial.

*Id.*, slip op. at 75-76, 1997 WL 583071 at *40 (citations omitted).

Finally, Joslin proffered Thomas Dillard, an experienced defense attorney and former prosecutor, as an expert witness who would testify that pretrial preparation of witnesses is common and often necessary. Mr. Dillard's testimony was to rebut the cross-examination of Joslin with regard to his trial preparation. The trial court denied the request that Mr. Dillard testify as an expert on that issue; the appellate court found that to be an abuse of discretion, given the fact that the trial court also refused to give the jury a limiting instruction with respect to pretrial preparation. The appellate court determined the error to be harmless.

In the case at bar, we conclude that by denying both the limiting instruction and the expert testimony, the trial judge abused his discretion. Given the nature of the cross-examination of the Defendant, we believe that the proffered testimony of Thomas Dillard was relevant. We see no basis for not allowing the testimony and, in fact, the trial judge offered no reason when

32

he excluded the testimony. In our view, the limiting instruction would have accomplished the same objectives as Dillard's testimony. Had the trial court chosen to give the limiting instruction but denied Dillard's testimony, we would not find an abuse of discretion under the facts as they developed in this case. To deny both the limiting instruction and the testimony without explaining a rationale for the decision, however, was an abuse of the trial judge's discretion.

Although we believe the trial court's actions constituted an abuse of discretion, we nevertheless conclude that the error was harmless beyond a reasonable doubt. The prosecutor's questions concerning pretrial preparation appeared to be intended to challenge the credibility and persuasiveness of the Defendant's compelling testimony on direct examination. This challenge to the Defendant's credibility, however, paled in comparison to the prosecutor's vigorous cross-examination regarding details of the history between the Defendant and the victim as well as the events which occurred on the day of the shooting. On cross-examination, the prosecutor was able to portray the history between the Defendant and the victim in a different light from that presented on direct examination, effectively suggesting that the Defendant had taken advantage of the victim monetarily. Furthermore, the prosecutor was able to examine and to emphasize certain actions of the Defendant on the day of the shooting from a more critical perspective. Given the rigorous cross-examination of the Defendant on other matters, we are confident that the trial court's error with regard to the questions concerning pretrial preparation did not affect the result of the trial.

*Id.*, slip op. at 50-51, 1997 WL 583071 at ** 26-27 (citation and footnote omitted).

**2. Exclusion of rebuttal witnesses.** Joslin alleges the trial court erred in excluding rebuttal testimony as to his state of mind and the harassment he had endured from the victim. According to Joslin, this testimony was necessary to rebut the State's claims that Joslin "made up" his testimony to "create a defense." The Tennessee Court of Criminal Appeals summarized the issue as follows:

The Defendant contends that the trial court erroneously excluded evidence of his out-of-court statements concerning his relationship with the victim. After his own testimony, the Defendant presented several witnesses

33

who testified concerning his state of mind with regard to the victim. On direct examination, defense counsel sought to question these witnesses, principally family members of the Defendant, about what the Defendant had told them concerning the threatening and harassing actions taken by the victim. Upon the prosecutor's objections, the trial court did not permit the witnesses to recount what the Defendant had told them about his relationship with the victim. Instead, the trial court limited their testimony to their observations of the Defendant's state of mind and the Defendant's statements to them actually expressing his state of mind.

*Id.*, slip op. at 62, 1997 WL 583071 at *33 (citation omitted). The appellate court then considered Joslin's two arguments for admission of the testimony and found them persuasive. The court further found that the trial court erred in excluding the testimony, but that the error was harmless.

The Defendant offered the trial court two separate arguments in favor of the admission of testimony from defense witnesses about the Defendant's statements to them regarding the threatening and harassing conduct of the victim. The trial court found both arguments unpersuasive. The Defendant now raises both arguments on appeal. He first argues that such testimony was admissible as a nonhearsay declaration to prove circumstantially his state of mind. The Defendant asserts that the testimony from defense witnesses about what he had told them concerning the victim's conduct was not offered to prove the truth of the matter asserted, namely that the victim had engaged in threatening or harassing conduct. Instead, the testimony was offered to demonstrate circumstantially the Defendant's fear of the victim.

We believe that the Defendant has made a sound argument. Given that the testimony from defense witnesses about the Defendant's statements concerning the threatening and harassing conduct was not offered to prove the truth of the matter asserted, it was not hearsay. Such nonhearsay declarations have been deemed admissible where, as here, they were offered to prove circumstantially the declarant's state of mind. As a result, we conclude that the trial court erred in excluding such testimony.

We believe, however, that the trial court's error was harmless beyond a reasonable doubt. The Defendant testified fully about his relationship with the victim and the victim's threatening and harassing conduct. He also testified

34

fully about his fearful state of mind with regard to the victim. Moreover, the defense witnesses from whom the above testimony was sought were permitted to testify about their observations of the Defendant's mental state. These witnesses all confirmed that the Defendant was fearful of the victim. Accordingly, we believe that the Defendant was permitted to introduce ample evidence of his state of mind with regard to the victim. Any additional testimony about nonhearsay declarations of the Defendant offered to prove circumstantially his state of mind would have been largely superfluous. We can only conclude that the exclusion of this testimony did not affect the result of the trial.

The Defendant's second argument in favor of admission of the testimony characterizes the Defendant's statements to defense witnesses about the victim's threatening conduct as prior consistent statements offered to rebut the State's claim of recent fabrication. We agree that prior consistent statements may be admissible to rehabilitate a witness when insinuations of recent fabrication have been made or when deliberate falsehood has been implied. Such statements do not qualify as hearsay because they are offered solely to rehabilitate the credibility of a witness rather than for the truth of the matters asserted in the statements. Before prior consistent statements become admissible in this regard, however, the testimony of the witness must have been assailed or seriously questioned to the extent that his or her credibility needs rehabilitation.

In the case *sub judice*, the prosecutor's cross-examination of the Defendant was vigorous and challenged his credibility. In fact, the prosecutor's principal strategy for attacking the Defendant's proof was to suggest that the Defendant was "creating a defense." In view of the attack on the Defendant's credibility, we believe that testimony from defense witnesses demonstrating that the Defendant had related the same incidents of threatening and harassing conduct on behalf of the victim well before the shooting was admissible to rebut the prosecutor's insinuation of recent fabrication or deliberate falsehood.

The error in excluding this testimony, however, was harmless beyond a reasonable doubt. Although the prosecutor assailed the Defendant's credibility on cross-examination, the principal challenge to his credibility involved his reaction to the conduct of the victim rather than whether the conduct of the victim had actually occurred. The Defendant testified on direct examination that the victim's conduct made him fearful of the victim. The prosecutor's cross-examination suggested that the Defendant reacted to the victim's conduct with anger and that the Defendant's testimony that he was

35

fearful was not credible. As we stated above, the defense witnesses whose testimony was limited by the trial court's ruling were permitted to testify about their observations of the Defendant's mental state, and they all confirmed that the Defendant was fearful of the victim. Any further testimony on the part of those witnesses concerning what the Defendant had told them with regard to the victim's conduct would have been only marginally relevant and merely superfluous to the issue of the credibility of the Defendant's testimony about his fearful state of mind in reaction to the victim's conduct. Accordingly, we conclude that the trial court's error in this regard did not affect the result of the trial.

*Id.*, slip op. at 62-65, 1997 WL 583071 at **33-34 (citations omitted).

**3. Exclusion of evidence of the victim's prior bad acts.** Joslin alleges the trial court erred in excluding evidence of the victim's prior violent acts. According to Joslin, this evidence was necessary to corroborate his self-defense claim that the victim was the first aggressor. The Tennessee Court of Criminal Appeals summarized the issue as follows:

The Defendant next contends that the trial court erroneously excluded evidence of the victim's violent and threatening conduct toward other individuals. Defense counsel sought to question several witnesses about their observation of violent or threatening conduct committed by the victim against other individuals. For instance, it appears from the proffer of defense witness Robert Ferguson that he became involved in a dispute with Rodney Shepard and his brother, Jimmy Shepard, over the completion of plumbing work at a bar owned by Ferguson. Shortly thereafter, Ferguson began to receive threatening telephone calls from the victim. In addition, according to the proffer of David Riley, Rodney Shepard committed several threatening acts and made threatening telephone calls to him after a dispute arose over Riley's refusal to allow Shepard to place his trailer on property owned by Riley. The Defendant also offered a proffer from Judy Branstetter, who lived across the street from Rodney Shepard on Dante Road. According to Branstetter's proffer, a dispute arose between her brother-in-law and Rodney Shepard. During a telephone conversation with Rodney Shepard's wife, Branstetter overheard Shepard shouting in the background to tell Branstetter's brother-in-law to "meet me out in the middle of the street, and I will take care of it."

The trial court excluded all such testimony, ruling that evidence of specific violent acts of the victim against third persons which were unknown to the Defendant at the time of the shooting could only be inquired into on cross-examination of the victim. The trial judge based his ruling on his interpretation of Tennessee Rule of Evidence 405(a), *State v. Hill*, 885 S.W.2d 357 (Tenn.Crim.App.1994), and *State v. Ray*, 880 S.W.2d 700 (Tenn.Crim.App.1993). Defense counsel pointed out that, given that this case involved a homicide, he could not cross-examine the victim, asking the trial court "who are we supposed to cross-examine about this?" The trial court stated simply, "Well, I don't know."

On appeal, as at trial, the Defendant asserts that he was not offering evidence of the victim's violent conduct against other individuals as substantive proof of the victim's character or to prove that the victim acted in accordance with a character trait. Instead, the Defendant maintains that he was offering such evidence to corroborate his self-defense claim that the victim was the first aggressor. The Defendant contends that evidence of the victim's violent conduct toward others, even if unknown to the Defendant at the time of the shooting, was admissible for that limited purpose.

*Id*., slip op. at 66-67, 1997 WL 583071 at *35.

The Tennessee Court of Criminal Appeals concluded that evidence of the victim's

violent conduct against third persons should have been admitted under the circumstances, and

thus the trial court erred in excluding the testimony, but found the error was harmless.

From our review of the entire record, however, we believe that the error in excluding this testimony was harmless. It is true that the Defendant was not permitted to introduce testimony from several defense witnesses about the victim's threatening and violent conduct toward others. Yet the Defendant was permitted to present testimony from multiple witnesses that the victim had a reputation for violence in the community. In addition, the Defendant himself was permitted to testify about the victim's threatening and violent conduct toward others of which he was aware at the time of the shooting as proof of his fearful state of mind with respect to the victim. Furthermore, defense witnesses Robert Ferguson and Carroll Votaw were permitted to relate specific threats made by the victim against the Defendant in their presence even though the Defendant was unaware of those threats. While it was error for the trial court to exclude testimony about the victim's specific acts of violence toward

37

others offered for limited corroborative purposes, we are confident that the jury had before it a complete and accurate description of the violent, aggressive nature of the victim. Accordingly, we conclude that the trial court's error did not affect the result of the trial.

*Id.*, slip op. at 69-70, 1997 WL 583071 at *37 (citation omitted).

**4. Conclusion**.  Joslin argues that the aforementioned errors and abuse of discretion violated his constitutional right to present his theory of self-defense.  The Tennessee Court of Criminal Appeals agreed that the trial court made several errors on evidentiary matters, but concluded the errors were harmless under the *Chapman* standard.

[T]he trial court did make several erroneous evidentiary rulings during the course of this lengthy trial. After considering the entire record, however, we do not believe that any of these errors affected the verdict. Furthermore, we simply cannot conclude that the trial court's erroneous evidentiary rulings deprived the Defendant of a meaningful opportunity to present a complete and effective defense. In our view, the trial court's errors were harmless beyond a reasonable doubt.

*Id.*, slip op. at 77, 1997 WL 583071 at 41 (citing *Chapman*, 386 U.S. at 24).

Joslin contends that the appellate court summarily came to this conclusion without a detailed analysis.  A fair reading of the court's opinion, however, reveals that the court carefully considered each error and its effect on the trial.  This court has reviewed the trial transcript and concludes that the errors complained of did not have a "substantial and injurious effect or influence" on the verdict.  *Brecht*, 507 U.S. at 623.

Joslin presented evidence of his mental state with regard to the victim, that the victim had written the derogatory signs, that the victim had a reputation for violence, and that Joslin

38

was fearful of the victim.  Accordingly, Joslin has failed to demonstrate that the appellate court's finding of harmless error was objectively unreasonable as required by *Williams*.

## B. Impeachment of Joslin's Credibility

Joslin alleges two categories in which his credibility was improperly impeached, each of which are set forth below.

**1. Improper cross-examination**.  Joslin alleges that he was improperly cross-examined by the prosecutor as to his trial preparation and based upon a stale misdemeanor conviction, both of which were related.  The Tennessee Court of Criminal Appeals summarized the issues as follows:

> [T]he Defendant challenges the actions of both the trial court and the prosecutor regarding cross-examination of the Defendant concerning his pretrial preparation with defense counsel. These questions, in turn, led to additional cross-examination generally concerning the Defendant's prior criminal record. He challenges this line of questioning as well.

> During cross-examination, the prosecutor asked the Defendant how many times he had "sat in a witness stand and rehearsed" his testimony with defense counsel. The Defendant seemed unsure as to the point of the prosecutor's question. As a result, the prosecutor went on to recite details of the Defendant's pretrial preparation, such as other attorneys playing the roles of judge and district attorney, apparently in an effort to refresh the Defendant's memory. Defense counsel objected to this line of questioning. The trial court overruled the objection. As part of his answer to the prosecutor's questions, the Defendant testified as follows:

> > Q.  Mr. Joslin, when you practiced your testimony, you sat in a witness stand like you're sitting in today or similar, did you not?
> > A.  Yes, sir.

Q. And you had a judge who was sitting next to you. Do you know now that his name is Jonathan Cooper?

A. I didn't know his name. And before, when you asked me if I had sat in a courtroom, I--I didn't know what you meant. I had not sat in a courtroom. I went up--I did go to a little room with just--

Q. A witness stand?

A. --a small--

Q. Small courtroom--

A. --tiny little place, and I was sitting at a witness stand, and someone was supposed to have been representing a judge, and someone was supposed to have been representing somebody else, and I was to get familiar with what type of procedures I'd been going through. *I've never been through nothing like that*, and I guess it was to keep me from being so nervous or something. I don't know why.

(emphasis added).

At this point, the prosecutor requested a bench conference. During this conference, the prosecutor alerted the trial court to his intention to ask the Defendant about misdemeanor convictions from 1973. Defense counsel objected, asserting that the convictions were too remote to be admissible and that the State had not complied with the provisions of Rules 608 or 609 of the Tennessee Rules of Evidence. In response, the prosecutor argued that the Defendant had made a sweeping claim of good conduct, thereby opening the door to impeachment without regard to strict compliance with Rule 608. The trial court eventually allowed limited questioning of the Defendant. The prosecutor, with the trial court's agreement, asked the Defendant if he had been through a bench trial in Knox County General Sessions Court before Judge Jewell Watson on April 6, 1973. The Defendant responded affirmatively. The prosecutor did not introduce copies of the Defendant's convictions.

Faced with this cross-examination, defense counsel took two courses of action. Once the trial court had decided to allow the questions regarding pretrial preparation, defense counsel requested that the trial court give a limiting instruction to the jury. The requested limiting instruction reads in pertinent part:

40

It is quite natural and proper that a defendant will prepare his testimony with his attorney prior to the trial. No attorney would begin a trial without discussing questions that may be asked of his client during the case and preparing his client to testify. In the same way, the prosecutor typically prepares his witnesses for their testimony prior to trial. The fact that the attorneys have prepared their witnesses for trial is a proper function of trial counsel and is to be expected.

The trial court denied the requested limiting instruction. Defense counsel's second course of action was to request permission to call an expert witness to rebut the prosecutor's questioning of the Defendant regarding pretrial preparation. That witness, Thomas Dillard, had practiced criminal law extensively, both as a prosecutor and as a defense attorney. Dillard would have testified as follows:

It is my opinion that it is common and expected practice for prosecuting attorneys and defense attorneys alike to prepare witnesses for testimony in courtroom proceedings. Witnesses are often unfamiliar with and extremely nervous about courtroom proceedings. These witnesses are often placed at ease by this process, and can more accurately communicate their testimony.

As a prosecutor, I have often taken witnesses into an empty courtroom in advance of their testimony, and placed them on the witness stand to go through their direct examination. I often had these witnesses undergo a mock cross examination, either with another attorney or me as the cross-examiner. I have often followed the same procedure as a defense attorney.

In my opinion, preparation of witnesses in this manner is often necessary and common practice, and should be expected of thorough and competent counsel.

The trial court did not permit Dillard to testify at trial.

*State v. Joslin*, slip op. at 46-48, 1997 WL 583071 at **24-25.

The Tennessee Court of Criminal Appeals found that the cross-examination regarding

trial preparation was relevant and did not violate Joslin's Sixth Amendment right to counsel.

41

Thus, the appellate court found no error with the trial court allowing the questioning. However, the court concluded "that by denying both the limiting instruction and the expert testimony, the trial judge abused his discretion." *Id.*, slip op. at 50, 1997 WL 583071 at *26. The court held, however, that the error was harmless.

> Although we believe the trial court's actions constituted an abuse of discretion, we nevertheless conclude that the error was harmless beyond a reasonable doubt. The prosecutor's questions concerning pretrial preparation appeared to be intended to challenge the credibility and persuasiveness of the Defendant's compelling testimony on direct examination. This challenge to the Defendant's credibility, however, paled in comparison to the prosecutor's vigorous cross-examination regarding details of the history between the Defendant and the victim as well as the events which occurred on the day of the shooting. On cross-examination, the prosecutor was able to portray the history between the Defendant and the victim in a different light from that presented on direct examination, effectively suggesting that the Defendant had taken advantage of the victim monetarily. Furthermore, the prosecutor was able to examine and to emphasize certain actions of the Defendant on the day of the shooting from a more critical perspective. Given the rigorous cross-examination of the Defendant on other matters, we are confident that the trial court's error with regard to the questions concerning pretrial preparation did not affect the result of the trial.

*Id.*, slip op. at 51, 1997 WL 583071 at *27 (citation and footnote omitted).

The Tennessee Court of Criminal Appeals also concluded that the cross-examination as to Joslin's prior misdemeanor conviction "was improper and that the trial court erred in admitting the testimony." *Id.*, slip op. at 52, 1997 WL 583071 at *27. The appellate court, however, found the error to be harmless.

> We note once again that the Defendant's convictions were not introduced at trial nor were they even mentioned directly. The prosecutor's questions about whether the Defendant had experienced a trial procedure in 1973 were obviously an attempt to challenge the Defendant's credibility. This challenge constituted only two questions out of nearly one hundred pages of

42

cross-examination. As we stated above, the prosecutor's cross-examination regarding details of the history between the Defendant and the victim as well as the events which occurred on the day of the shooting was quite vigorous. The challenge to the Defendant's credibility posed by the two questions concerning a 1973 trial procedure paled in comparison to the remainder of the prosecutor's cross-examination of the Defendant. Accordingly, we believe that the errors with regard to the questions concerning the 1973 trial procedure did not affect the result of the trial.

*Id.*, slip op. at 57-58, 1997 WL 583071 at *30 (citation omitted).

Joslin argues that the aforementioned cross-examination was prejudicial and a violation of his constitutional rights, and thus not harmless error. This court has reviewed the trial transcript, with specific attention to Joslin's testimony on both direct and cross-examination [Court File No. 2, Addendum 1, Transcript of the Evidence, vol. 6-10, pp. 565-945], and concludes that the errors complained of did not have a "substantial and injurious effect or influence" on the verdict. *Brecht*, 507 U.S. at 623.

As the appellate court noted, Joslin's conviction was not mentioned directly to the jury; rather the jury heard the following:

> Q.     Mr. Joslin, isn't it true that on April the 6th of 1973 you had a bench trial before the Honorable Jewell Watson in Knox County General Sessions Court?
>
> MR. MONCIER:  Objection.
>
> THE COURT:  Overruled.
>
> A.     Yes, I did.

[Court File No. 2, Addendum 1, Transcript of the Evidence, vol. 9, p. 880]. The evidence of trial preparation likewise constituted a very small part of a rigorous cross-examination, in

43

which the prosecutor seriously challenged Joslin's credibility on key issues, such as whether

he had taken financial advantage of the victim, whether he was actually afraid of the victim,

his reasons for carrying the gun with him that day, hiding the gun after the shooting, and his

vague answers to the police. Accordingly, Joslin has failed to demonstrate that the appellate

court's finding of harmless error was objectively unreasonable as required by *Williams*.

    **2. Improper comments on the credibility of Joslin and the defense proof.** Joslin

alleges that improper comments by both the prosecutor and the trial judge constituted

improper impeachment. These allegations were considered by the Tennessee Court of

Criminal Appeals, and likewise raised by Joslin, in the sections regarding allegations of

prosecutorial misconduct and judicial bias, respectively, and this court will do the same. *See*

parts III. and IV. of this discussion, *infra*.

*C. Right to Confront Accusers*

    Joslin alleges he was denied his Sixth Amendment right to confront the witnesses

against him when he was not allowed to recall a State's witness, Judy Allen, for further cross-

examination. As explained by the Supreme Court in *Delaware v. Van Arsdall*, 475 U.S. 673

(1986):

> The Confrontation Clause of the Sixth Amendment guarantees the right
> of an accused in a criminal prosecution "to be confronted with the witnesses
> against him." The right of confrontation, which is secured for defendants in
> state as well as federal criminal proceedings, "means more than being allowed
> to confront the witness physically." Indeed, "[t]he main and essential purpose

44

of confrontation is *to secure for the opponent the opportunity of cross-examination."*

*Id*. at 678 (quoting *Davis v. Alaska*, 415 U.S. 308, 315 (1974) (internal quotations omitted)) (citation omitted). Nevertheless, "trial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant." *Id*. at 679. In addition, the harmless error rule of *Chapman* applies in cases involving a violation of the Confrontation Clause. "[W]e hold that the constitutionally improper denial of a defendant's opportunity to impeach a witness for bias, like other Confrontation Clause errors, is subject to *Chapman* harmless-error analysis." *Id*. at 684.

> The correct inquiry is whether, assuming that the damaging potential of the cross-examination were fully realized, a reviewing court might nonetheless say that the error was harmless beyond a reasonable doubt. Whether such an error is harmless in a particular case depends upon a host of factors, all readily accessible to reviewing courts. These factors include the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence of absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case.

*Id*. (citations omitted).

The Tennessee Court of Criminal Appeals summarized the issue regarding Ms. Allen as follows:

> Allen was the last witness to testify on June 27, 1995. Defense counsel cross-examined Allen regarding slightly inconsistent statements given during a deposition for the related civil case. Defense counsel had misplaced his copy

45

of that deposition, however, and used an unmarked copy during his cross-examination. Allen was then examined by the prosecutor on redirect and, with the conclusion of her testimony, court stood in recess for the night.

On the morning of June 28, 1995, the first witness to be called was Allen's daughter, Michelle Flatt. Just before Flatt was called, defense counsel requested that Judy Allen be recalled. Defense counsel explained that he had located his copy of the deposition and wished to ask her a question about another inconsistency between the deposition and her testimony on direct examination. The inconsistency concerned which hand the victim had in his pocket as he approached the Defendant's van. On direct examination, Allen testified that the victim's left hand was in his pocket. During the deposition, Allen stated that she could not remember which hand the victim had in his pocket. The trial court denied the Defendant's request to recall Allen.

Faced with this ruling, the Defendant offered an alternative to the trial court. The Defendant suggested that they admit into evidence the portion of Allen's deposition in which she stated that she was unsure as to which hand the victim had in his pocket. The Defendant argued that, as a prior inconsistent statement offered for impeachment purposes, Allen's statement was not hearsay. The trial court denied the Defendant's alternative request.

*State v. Joslin*, slip op. at 60-61, 1997 WL 583071 at **31-32.

The appellate court first noted that "whether to permit a witness to be recalled is entrusted to the sound discretion of the trial court and will not be reversed on appeal absent abuse." *Id.*, slip op. at 61, 1997 WL 583071 at *32 (citations omitted). The court then found that "the trial court's refusal to allow Judy Allen to be recalled or to allow the inconsistent portion of her deposition to be introduced into evidence constituted an abuse of discretion." *Id.*, slip op. at 61, 1997 WL 583071 at *32. The court concluded, however, that the error was harmless.

We do not, however, believe that this error affected the result of the trial. The Defendant attempted to recall Judy Allen in an effort to impeach her with a prior inconsistent statement, thereby assailing her credibility. Defense

46

counsel had already effectively questioned Allen's credibility through the remainder of cross-examination. We are satisfied that any error in this regard was harmless.

*Id.*, slip op. at 62, 1997 WL 583071 at *32.

This court has reviewed Ms. Allen's testimony, both on direct examination and cross-examination, [Court File No. 2, Addendum 1, Transcript of the Evidence, vol. 3, pp. 231-274], and agrees that Joslin's attorney effectively questioned her credibility on other matters. Thus, this court concludes that the error complained of did not have a "substantial and injurious effect or influence" on the verdict, *Brecht*, 507 U.S. at 623, and that Joslin has failed to demonstrate that the appellate court's finding of harmless error was objectively unreasonable as required by *Williams*.

### D. Self-Defense Jury Instruction

Joslin alleges that the trial court's misleading departure from the pattern jury instruction on self-defense, and the prosecutor's closing argument exploiting the error, violated his due process right. The Tennessee Court of Criminal Appeals summarized the issue as follows:

[T]he Defendant contends that the trial court's jury instruction on self-defense was erroneous and that the prosecutor's closing argument compounded that error. The Defendant argues that the erroneous instruction misled the jury into believing that a use of physical force by the victim was required to support a claim of self-defense.

The proof adduced at trial obviously raised an issue of self-defense. The Defendant submitted a special jury instruction request on that issue. The

47

Defendant's special request differed slightly from the pattern jury instruction on self-defense. After hearing argument, the trial court denied the Defendant's special request on self-defense, choosing instead to give the pattern jury instruction.

The portion of the instruction which the Defendant challenges occurred at the very beginning of the entire instruction. The trial court's instruction on self-defense began as follows:

> Included in the defendant's plea of not guilty is his plea of self-defense.
> When a person is assaulted *by the use of force* in such a way as to create in his mind a reasonable belief that he is in imminent and actual danger of death or serious bodily injury, he will be justified in using force to defend himself even to the extent of killing another human being.

(emphasis added). The self-defense jury instruction is quite long and continues for two more pages in the record. The instruction given by the trial court mirrors the pattern jury instruction in all ways except for the emphasized phrase above and minor changes suggested by the Defendant.

The Defendant contends that the emphasized language is erroneous in that it omits a relevant phrase suggested by the options under the pattern jury instruction itself. The opening sentence of the pattern jury instruction reads:

> When a person is assaulted, by the *[use of force] [attempted use of force]*, in such a way as to create in his mind a reasonable belief that he is in imminent and actual danger of [death] [serious bodily injury], he will be justified in [threatening] [using] force to defend himself even to the extent of killing another human being.

The Defendant argues that the evidence presented at trial was such that both "use of force" and "attempted use of force" were required.

The trial court's omission of "attempted use of force" from the opening sentence of the instruction is somewhat curious. During a Rule 30 hearing prior to instructing the jury, the trial court, the prosecutor and the Defendant all agreed that the proof presented at trial supported the inclusion of both the

48

"use of force" and the "attempted use of force" language. In considering the contention, the Defendant suggested that the trial court also define "assault" for the jury in order to clarify further that physical force or contact by the victim is not a prerequisite to a valid self-defense claim. The trial court declined to define "assault." After the trial court had read the charge to the jury, the Defendant renewed his special requests and indicated to the trial court that the self-defense instruction was misleading with regard to physical force, particularly in light of the content of the prosecutor's closing argument. The Defendant again requested that the trial court define "assault" to ensure that the jury understood that physical force or contact by the victim was not required. The trial court again declined, stating that "assault" is a term which "needs no further description."

The initial omission of "attempted use of force" is even more curious given that both phrases are used together later in the instruction. As we stated above, the self-defense instruction is rather lengthy. The "attempted use of force" language is omitted from the initial sentence of the instruction. Later in the opening paragraph, however, the trial court used both options as follows: "The use of force can only be to the degree reasonably believed to be immediately necessary to protect against the other's *use or attempted use of unlawful force*." (Emphasis added). In addition, several paragraphs later in the instruction, the trial court used the following language:

> The threat or use of force against another is not justified if the defendant provoked the deceased's *use or attempted use of unlawful force*, unless the defendant abandoned the encounter or clearly communicated to the deceased the intent to do so, and the deceased nevertheless *continued or attempted to use unlawful force* against the defendant.

(Emphasis added). Thus, it appears that the only significant difference between the pattern instruction and the instruction actually given to the jury is the omission of the "attempted use of force" language from the opening sentence of the instruction.

*State v. Joslin*, slip op. at 39-41, 1997 WL 583071 at **19-20 (quoting T.P.I.--Crim. 40.06

(3d ed.) (emphasis added)) (citations and footnotes omitted).

The appellate court determined that the self-defense instruction was erroneous, but concluded the error was harmless. Joslin contends that the appellate court came to this conclusion without analysis. A fair reading of the court's opinion, however, indicates that the court carefully considered the issue.

> The Defendant certainly presents a compelling argument. As we pointed out above, however, the self-defense jury instruction is quite lengthy. Aside from the omission of the "attempted use of force" language from the initial sentence, the remainder of the instruction was complete and correct. More specifically, the self-defense instruction correctly focused the jury's inquiry on the Defendant's state of mind and the reasonableness of his beliefs. The instruction also allowed the jury to consider the history between the Defendant and the victim. Finally, the "use of force" language was accompanied by the "attempted use of force" language in subsequent phrases of the self-defense instruction.

> After considering the entire instruction and the proof introduced at trial, we are confident that the trial court's erroneous jury instruction did not affect the result of the trial. The trial court's error was harmless beyond a reasonable doubt.

*Id.*, slip op. at 45, 1998 WL 583071 at **23-24 (citations omitted). This court agrees that that the error complained of did not have a "substantial and injurious effect or influence" on the verdict, *Brecht*, 507 U.S. at 623, and that Joslin has failed to demonstrate that the appellate court's finding of harmless error was objectively unreasonable as required by *Williams*.

### III. The Prosecutorial Misconduct So Infected Petitioner's Trial as to Violate His Right to a Fair Trial and Due Process of Law.

50

Joslin alleges that the prosecutor in this case, Robert Jolley, made improper statements regarding the credibility of defense witnesses and Joslin's claim of self-defense. He also alleges that Mr. Jolley improperly impeached Joslin based upon a stale misdemeanor conviction and Joslin's trial preparation. Joslin further alleges that Mr. Jolley misstated the law in his closing argument with respect to the burden of proof and the defense of self-defense.

For a petitioner to obtain habeas corpus relief, "the prosecutor's statements must be so egregious as to render the trial fundamentally unfair. This determination is to be made by evaluating the totality of the circumstances surrounding each individual case." *Angel v. Overberg*, 682 F.2d 605, 608 (6th Cir. 1982). *See also United States v. Payne*, 2 F.3d 706, 712 (6th Cir. 1993) ("If the court finds prosecutorial misconduct, the court must then consider whether, on the entire record, the misconduct can be said to be harmless. To deny a defendant a fair trial, prosecutorial misconduct must be 'so pronounced and persistent that it permeate[d] the entire atmosphere of the trial.'") (quoting *United States v. Vance*, 871 F.2d 572, 577 (6th Cir. 1989)).

The Tennessee Court of Criminal Appeals found several instances of prosecutorial misconduct, such as the prosecutor's comments that conveyed his personal beliefs about the credibility of the defense proof, and his misstating the law on the burden of proof and the defense of self-defense during closing argument. *State v. Joslin*, slip op. at 95-96, 101-102, 1997 WL 583071 at **50, 54. The appellate court, however, found no prejudice to Joslin.

In our discussion of the categories of alleged misconduct above, we concluded that there were several instances of prosecutorial misconduct. The prosecutor improperly stated his personal beliefs regarding the credibility of the Defendant's proof. In addition, the prosecutor misstated the law as it relates to the presumption of innocence and the burden of proof. We must take note, however, that the record in this case contains nearly three thousand pages. It is also readily apparent from the record that this case was "forcefully" tried by counsel with some history of antagonism. Viewed in context, the prosecutor's improper conduct was slight and relatively infrequent. Moreover, given the sheer volume of the record, we do not believe that any undue emphasis was placed upon the instances of misconduct. Furthermore, the prosecutorial misconduct did not prevent the Defendant from presenting a thorough defense.

*Id.*, slip op. at 103, 1997 WL 583071 at *54. The court also noted the following:

[I]t appears from the record that there is some history of antagonism between the prosecutor and defense counsel. It is quite obvious that this trial was "hard-fought" by both attorneys. There is nothing in the record, however, to indicate that the prosecutor acted in bad faith in making the improper remarks. Rather, it seems that the prosecutor had momentary lapses of judgment on a few occasions over the course of a trial which lasted nearly three weeks. We recognize that the prosecutor made errors, but we discern no improper intent on behalf of the prosecutor.

*Id*, slip op. at 104, 1997 WL 583071 at *55.

As noted earlier, this court has reviewed the entire trial transcript and concludes that the prosecutor's misconduct did not render the trial fundamentally unfair. In this case, Mr. Jolley vigorously represented the State in his prosecution of Joslin. Joslin's attorney, Herbert S. Moncier, in turn presented a vigorous defense. Accordingly, Joslin has failed to demonstrate that the appellate court's finding in this regard was objectively unreasonable as required by *Williams*.

52

**IV.    The Trial Court Displayed Judicial Bias Which Denied Petitioner the Right to a Fair Trial and the Due Process of Law under the Fifth and Fourteenth Amendments.**

Joslin alleges the trial court exhibited bias against him by agreeing with the prosecutor on matters involving the credibility of the defense, by making improper comments on the credibility of the defense, and by abusing his discretion on evidentiary rulings.  The standard for evaluating allegations of judicial bias is whether the trial was rendered fundamentally unfair.

> "Unless they amount to constitutional violations, prejudicial comments and conduct by a judge in a criminal trial are not proper subjects for collateral attack on a conviction." In collateral proceedings, the test is "whether the errors alleged ... could have rendered [the] trial fundamentally unfair." To violate a defendant's right to a fair trial, "a trial judge's intervention in the conduct of a criminal trial would have to reach a significant extent and be adverse to the defendant to a substantial degree."

*McBee v. Grant*, 763 F.2d 811, 818 (6th Cir. 1985) (quoting, respectively, *Brinlee v. Crisp*, 608 F.2d 839, 853 (10th Cir.1979); *Buckelew v. United States*, 575 F.2d 515, 518 (5th Cir.1978); *Daye v. Attorney General of New York*, 712 F.2d 1566, 1572 (2d Cir.1983)).  *See also Harrington v. Iowa*, 109 F.3d 1275, 1280 (8th Cir. 1997) ("In considering judicial misconduct on habeas review, we examine the trial judge's behavior in the context of the entire trial to determine whether the behavior was so prejudicial as to violate due process."); *Duckett v. Godinez*, 67 F.3d 734, 740 (9th Cir. 1995) (on habeas review, the reviewing court "must ask whether the state trial judge's behavior rendered the trial so fundamentally unfair as to violate federal due process under the United States Constitution").

There was one comment by the trial court that the Tennessee Court of Criminal Appeals found improper, but concluded it was harmless.

> After a careful review of the Defendant's allegations, we find only one which has a significant degree of merit. During the direct examination of the Defendant, a bench conference occurred in which the trial court instructed defense counsel not to delve into the fact that the Defendant prayed with the youth minister of his church about the situation with the victim on the morning of the shooting. When direct examination resumed, defense counsel asked the Defendant a relevant, open-ended, non-leading question. The Defendant, not knowing what had been discussed at the bench conference, mentioned the fact that he and his wife had prayed with the youth minister. The prosecutor immediately objected and stated, "Your Honor, this, obviously, shows ... his testimony is rehearsed...." The trial judge responded by commenting, "Yes, yes."
>
> We believe that the trial court's response to the prosecutor's objection was improper. The prosecutor's objection, taken in context with other remarks made during the trial, was a clear attempt to imply that the Defendant's testimony was not credible. The trial judge's affirmative response conveyed an impression from which the jury could have reasonably concluded that the trial judge did not find the Defendant to be a credible witness. In fact, this impression becomes clearer when we consider other remarks made by the trial court out of the jury's hearing when defense counsel objected to both the prosecutor's and the judge's comments and requested a curative instruction. In declining to give a curative instruction, the trial court stated that there was "a strong suspicion" that the Defendant's testimony was rehearsed and, thus, there was "probable cause" for the prosecutor's comment.
>
> We do not, however, believe that the trial court's comment deprived the Defendant of his constitutional right to a fair trial. The improper comment was a single remark made during the course of a three-week trial. The Defendant's credibility was much more vigorously questioned through effective cross-examination. Considering the record in its entirety, we are confident that the trial court's improper remark did not affect the outcome of the trial. The error was harmless beyond a reasonable doubt.

*State v. Joslin*, slip op. at 80-82, 1997 WL 583071 at *43 (citations omitted).

54

The appellate court found no indication of bias in the trial court's evidentiary rulings. *Id.*, slip op. at 82-87, 1997 WL at **44-46. The court did note that the trial court was "sometimes curt with defense counsel regarding proffer and jury-out hearing requests," but that "the trial court's demeanor did not adversely impact the credibility of the Defendant's proof. *Id.*, slip op. at 83-84, 1997 WL at *44. Under the circumstances, the appellate court found no merit to Joslin's allegations of judicial bias.

> In summary, as we discussed above, the trial court certainly made errors during the course of this often contentious, three-week trial. Given the length of the trial, the volume of evidence and the complexity of the legal issues involved, it is not surprising that there were some erroneous evidentiary rulings and improper comments. Yet we find no indication in those errors that the trial court exhibited a bias against the Defendant. Instead, we can only conclude that the trial court's demeanor and rulings did not improperly favor the State or have a prejudicial effect on the credibility of the Defendant's proof in support of his claim of self-defense. This issue is therefore without merit.

*Id.*, slip op. at 89-90, 1997 WL 583071 at 47.

Again, a review of the trial transcript fails to demonstrate that the trial judge's comments and errors rendered the trial fundamentally unfair. As noted, both attorneys sought to represent vigorously their clients. In *Todd v. Stegal*, 40 Fed.Appx. 25 (6th Cir. 2002), the petitioner alleged in his habeas corpus petition that he was denied due process by the conduct and comments of the trial judge.

> Petitioner contends that the trial judge consistently undermined and demeaned the defense and defense counsel, that the trial judge's treatment of petitioner's trial counsel was marked by hostility and impatience, and that he unmistakably communicated his bias and prejudice against the defense and defense counsel to the jury. Petitioner contends the trial judge's manner was so derisive, belittling, and insulting as to impinge on petitioner's fair trial rights. In support of this argument, petitioner highlights eight verbal

exchanges between his trial counsel and the judge, six of which occurred in the presence of the jury. Petitioner further argues that the trial judge engaged in prejudicial non-verbal behavior, such as rolling his eyes and using a derisive tone of voice.

*Id*. at 27. The Sixth Circuit disagreed, after first noting that "a trial judge has a duty 'to conduct the trial in an orderly fashion, to insure that the issues are not obscured and to act at all times with a view toward eliciting the truth.'" *Id*. (quoting *United States v. Tilton*, 714 F.2d 642, 643 (6th Cir. 1983)).

The trial judge in this case was attempting to do just that. The trial judge undeniably expressed some impatience and frustration with defense counsel during the trial, but his expressions were generally in response to defense counsel's combative style and his failure to accept the court's direction. The reprimands were not out of line, nor were they substantially adverse to the defendant himself. There is no showing that the trial judge ever intimated his opinion on the merits of the case. This is not a case where the trial court could, in any sense, be said to have indicated "a hostility to one of the parties, or an unwarranted prejudgment of the merits of the case, or an alignment on the part of the Court with one of the parties for the purpose of furthering or supporting the contention of such party.

*Id*. at 27-28 (quoting *Knapp v. Kinsey*, 232 F.2d 458, 465-67 (6th Cir.1956)).

Such was the case during Joslin's trial. As the Tennessee Court of Criminal Appeals noted, the trial judge was undeniably frustrated at times with continually sending the jury out for hearings and proffers of proof. *State v. Joslin*, slip op. at 83, 1997 WL 583071 at *44. However, this court fails to discern such judicial bias as to deny Joslin's right to due process. Accordingly, Joslin has failed to demonstrate that the appellate court's finding in this regard was objectively unreasonable as required by *Williams*.

56

## V.  The Cumulative Effect of All of the above Errors Denied Petitioner His Fifth and [Fourteenth] Amendment Rights to a Fair Trial and the Due Process of Law.

Joslin claims that the cumulative effect of the alleged errors resulted in a deprivation of fundamental fairness in violation of due process.  According to Joslin, the Tennessee Court of Criminal Appeals identified at least 14 constitutional violations, and that these worked together to create a fundamentally unfair trial process.  The Tennessee Court of Criminal Appeals considered and rejected Joslin's cumulative effect argument.

> From our review of the extensive record in this case, it plainly appears that this case was often contentious. Both the State and the Defendant presented compelling and persuasive evidence and arguments. We cannot escape the conclusion that this case presented a classic jury question. The jury resolved that question against the Defendant. We cannot conclude that the errors which occurred during trial cumulatively rose to a level influencing either the evidence available to the jury or the jury's reasoning process so as to affect their verdict.

*State v. Joslin*, slip op. at 104-105, 1997 WL 583071 at *55.

The Sixth Circuit has held that, regardless of whether each of a petitioner's alleged errors, standing alone, would require a finding of deprivation of due process, a court may look to whether the cumulative effect of the errors was such that the petitioner was denied fundamental fairness.  *See, e.g., Cooper v. Sowders*, 837 F.2d 284, 286 (6th Cir. 1988); *Walker v. Engle*, 703 F.2d 959, 968 (6th Cir. 1983).  These cases, however, were decided prior to the effective date of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), which amended 28 U.S.C. § 2254 with regard to the standard of review in habeas corpus cases.

57

The Supreme Court has not held that a district court may look to the cumulative effects of trial court errors in deciding whether to grant habeas corpus relief. *See Davis v. Burt*, 100 Fed.Appx. 340, 351 (6th Cir. 2004) ("Cumulative error is not a basis for granting habeas relief in non-capital cases."); *Scott v. Elo*, 302 F.3d 598, 607 (6th Cir. 2002) ("The Supreme Court has not held that constitutional claims that would not individually support habeas relief may be cumulated in order to support relief."); *Lorraine v. Coyle*, 291 F.3d 416, 447 (6th Cir. 2002) ("The Supreme Court has not held that distinct constitutional claims can be cumulated to grant habeas relief.").

Accordingly, Joslin is not entitled to relief on his cumulative effect claim. In addition, because there is no Supreme Court precedent in this regard, Joslin cannot demonstrate that the rejection by the Tennessee Court of Criminal Appeals of his cumulative effect argument was either contrary to or an unreasonable application of clearly established federal law as required by *Williams*.

V.    Conclusion

Petitioner Joslin is not entitled to habeas corpus relief and for that reason the respondent's motion for summary judgment will be **GRANTED**. Joslin having failed to make a substantial showing of the denial of a constitutional right, a certificate of appealability **SHALL NOT ISSUE**. 28 U.S.C. § 2253(c). The court **CERTIFIES** that any

appeal from this action would not be taken in good faith and would be totally frivolous. *See* Rule 24 of the FEDERAL RULES OF APPELLATE PROCEDURE.

**AN APPROPRIATE ORDER WILL ENTER.**

s/ Thomas A. Varlan
UNITED STATES DISTRICT JUDGE